## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 09-22680-CIV-COOKE/BANDSTRA

**NICOLE MICHELLE DEFONTES,**

>       **Petitioner,**

**v.**

**JOHN T. RATHMAN, Warden Federal
Detention Center Miami,
CARLOS RODRIGUEZ, Community
Corrections Manager for the Southern District of Florida,
HARLEY LAPPIN, Director Bureau of Prisons,**

>       **Respondents.**

_____/

### PETITIONER NICOLE MICHELLE DEFONTES' MOTION FOR ATTORNEYS' FEES AND COSTS AND INCORPORATED MEMORANDUM OF LAW

Petitioner Nicole Michelle Defontes, as the prevailing party and pursuant to the Court's Order dated September 30, 2010, moves this Court for the entry of an Order awarding her attorneys' fees and costs pursuant to the Equal Access to Justice Act, Title 28, United States Code, Section 2412, pursuant to Title 28, United States Code, Section 1927, and pursuant to the Court's own inherent authority.

### INTRODUCTION

To date, Petitioner Nicole Michelle Defontes has been forced to spend nearly $300,000 in attorney's fees, expert fees, and costs to challenge the Bureau of Prisons' ("BOP") violations of her Constitutional rights and violations of its own rules and regulations. Petitioner's attorneys gave the government every opportunity to avoid litigation and to find a resolution to the case in a civil, professional, and efficient manner. Instead, the government forced Nicole to go through the expense of filing a lawsuit to take the BOP to court. Even when Nicole proved her allegations, the case did not end there. The government multiplied the costs and expenses of this case by filing a meritless motion for reconsideration with affidavits, requiring Nicole to take depositions and seek document discovery to defend herself. Instead of cooperating with the depositions and discovery, the government fought the requests, necessitating motions to compel,

which this Court granted.  A case that could have been easily resolved with a simple phone call between the attorneys and the production of a laboratory report (which Nicole was entitled to receive under the BOP's own rules), wound up being a hotly contested, major federal case.  The government has acted unreasonably and in bad faith throughout this case, making an award to Nicole of the fees and costs associated with this litigation appropriate.

There are three separate grounds under which the Court may award fees and costs in this case.  First, because Nicole prevailed in a civil lawsuit against the U.S. government, the Equal Access to Justice Act ("EAJA") waives sovereign immunity and permits the Court to award Nicole her attorneys' fees and costs incurred in this case.  Under the EAJA, the Court can make this award if it finds either that: 1) the government has acted in bad faith, vexatiously, wantonly, or for oppressive reasons in the conduct of this litigation, or 2) the government's position on the merits of the case was not substantially justified.  Second, the Court may award fees pursuant to Section 1927 based on a finding that government's counsel has unreasonably multiplied the expense of these proceedings or acted in bad faith.  Third, the Court has the power under its own inherent authority to award fees for the bad faith conduct of counsel and parties before it.

As the Court has noted throughout this case, but for the fact that the Petitioner's father had sufficient resources to take on the U.S. government, Nicole would still be wrongfully imprisoned today.  An award of fees in this case will serve the public interest by encouraging the BOP to reexamine the way it applies its policies and procedures to give inmates meaningful process in disciplinary proceedings and to show respect and open lines of communications when the inmates are represented by counsel.  This memorandum of law will outline the factual and legal basis for the Court to award Nicole Defontes the full amount of attorneys' fees and costs she has been forced to spend prosecuting this case.

## PROCEDURAL BACKGROUND

On September 9, 2009, Nicole Defontes filed a verified Petition for Writ of Habeas Corpus and Writ of Mandamus (DE # 1) against Respondents John T. Rathman, the warden of the Federal Detention Center in Miami, Carlos Rodriguez, the Community Corrections Manager for the Southern District of Florida, and Harley Lappin, the Director of the Bureau of Prisons.  Counts 1 through 4 of the Petition were brought under the Court's federal question jurisdiction and mandamus jurisdiction, Title 28, United States Code, Sections 1331 and 1361, respectively.  Those counts asserted violations of Nicole's Fifth Amendment right to procedural due process by

the BOP in its disciplinary hearings and asked that the Court use its mandamus power to order that the BOP's hearing results be declared void and a new hearing conducted that comported with procedural due process and permitted Nicole to present evidence, have access to her attorney, and call witnesses.  (Compl. ¶¶ 6, 75-97).  Her primary complaint was that the BOP refused to allow her to cut a sample of her hair so she could have her own independent laboratory test the sample for the presence of drugs.  Nicole was seeking a Court mandamus order to force the BOP to permit the sample to be cut.

Count 5 asserted a claim under the Administrative Procedure Act, Title 5, United States Code, Section 702, asking that the Court review and overturn the BOP's final agency action denying Nicole's request to present evidence and finding her guilty in violation of her procedural due process rights.  (Compl. ¶¶ 6, 98-100).  Count 6 was the only count brought under the Court's habeas jurisdiction, Title 28, United States Code, Sections 2241 and 1641, and asked for a Writ of Habeas Corpus Ad Testificandum ordering the BOP to keep Nicole in the district pending resolution of this case.  After the BOP refused to keep Nicole in the district and was preparing to send her back to Danbury, Connecticut, the Court granted the writ of habeas corpus on September 21, 2009 (DE # 8) and ordered Respondent Rathman to have Nicole available in the district on October 7, 2009 for the U.S. Marshals to bring her to the hearing.

Reading Nicole's Petition as a whole, it is apparent she was challenging the application of the BOP's administrative rules and regulations to her situation, and she was not directly challenging her custody or seeking an immediate release from her incarceration.  The only part of her Petition that sounded in habeas was the part seeking an order from the Court that she remain in the district.  The remaining Counts that make up the heart of her Petition were an administrative and Constitutional Fifth Amendment challenge to the BOP's procedures as they were applied to her.  The primary remedy she sought was in the nature of mandamus, seeking a Court order that the BOP use the correct procedures and Constitutional due process in adjudicating her guilt in the disciplinary proceeding. (Compl. ¶¶ 79, 84, 90, 97, 100).  This distinction may be important because while the case law in the Eleventh Circuit is clear that attorneys' fees are available to prevailing parties in civil actions against the U.S. government seeking review of agency action and in cases seeking mandamus relief, the Eleventh Circuit has not addressed whether fees are available in cases that are purely habeas corpus in nature challenging the custody itself, not just the application of administrative rules and regulations.

The government never answered the Petition nor did it file a motion to dismiss.  Nicole filed a Motion for Expedited Consideration of Counts 1 and 6 of the Petition (DE # 3) and a Motion for Hearing (DE # 6).  The Court scheduled a hearing on the Motion for Expedited Consideration on October 7, 2009, and Nicole filed her Memorandum of Law in Support of Motion for Expedited Consideration of Counts 1 and 6 on October 2, 2009 (DE # 10).  The day before the hearing, the BOP abruptly released Nicole and filed a motion to cancel the hearing, which this Court denied.  At the hearing, the Court heard evidence of Constitutional violations by the BOP, including the failure of the BOP to abide by its own cutoffs for finding a drug test result as positive.  The remedy the Court crafted at the hearing, in light of continuing violations of procedure and Constitutional rights by the BOP, was to order Nicole transferred to the custody of the U.S. Probation office pending resolution of this case.  (DE # 14).  The Court transferred Nicole to the custody of U.S. Probation because it was "the only way to safeguard Ms. Defontes from repeated offenses" "in light of what appeared to be blatant Constitutional violations." Order Denying Respondents' Motion for Reconsideration ("Order") (DE # 41) at 2.  This was not relief that Petitioner specifically requested, but was a "an equitable remedy that satisfied both the law and justice."  *Id.* at 6.

After the Court ordered Nicole transferred to the custody of the U.S. Probation Office, the Respondents filed a Motion for Reconsideration (DE # 17), attaching affidavits of BOP personnel.  In the Motion for Reconsideration, the government raised the frivolous and bad faith argument that the reason Nicole's sentence did not expire on her official release date of November 8, 2009, thus mooting the case, was because Nicole needed four more drug counseling sessions that the government did not offer to her while she was wrongfully imprisoned due to the government's Constitutional violations.  As discovery and, indeed, common sense showed, its position was frivolous and needlessly dragged the case on for another year.  On September 30, 2010, the Court issued its Order Denying Respondents' Motion for Reconsideration (DE # 41) and reserved jurisdiction to entertain a motion for attorney's fees and costs from the Petitioner.

## FACTUAL BACKGROUND[1]

Throughout this litigation, the government has acted in bad faith, vexatiously, wantonly, and for oppressive reasons. The factual background that follows will demonstrate the decisions that were made by the Respondents and their counsel at the U.S. Attorney's Office to forcefully fight the case, even when it was clear they were wrong. Each time there was a choice for the government to make that could have reduced the costs of the litigation or eliminated the necessity of the lawsuit altogether, the government chose the costliest route. The government apparently believed it would win the war of attrition in this case, figuring that its resources are virtually unlimited and most prisoners do not have the deep pockets to spend money fighting the government.

At least some of the legal bases for awarding attorneys' fees and costs outlined in this motion entail a court finding that the government has acted in bad faith, vexatiously, wantonly, or for oppressive reasons or that it has needlessly multiplied the cost of these proceedings. The Court's Order identifies many examples of the government's bad faith throughout this case, and we outline several examples in this section.[2]

### The BOP Holds Nicole's UDC Hearing Without Her Present

The BOP prevented Nicole from having a chance to challenge the allegations that she had failed her drug test because they held her Unit Disciplinary Committee hearing without her even present. Order at 1. The BOP found her guilty of the violation at the hearing even though she had a right to be present. 10/7/09 Hearing Trans. at 7; 28 C.F.R. § 541(b) and (c). This would have been the first opportunity for Nicole to get a copy of the charges against her and the laboratory report that was being used to support those charges. To make matters worse, the BOP never informed Nicole that the hearing was held and we only found out about it through discovery.

---

[1] For purposes of the factual background for this motion, Petitioner relies on documents and transcripts already part of the record, including documents and transcripts entered as docket entries 10, 15, 17, 26, 29, 30, and 38.

[2] Should the Court wish to hear additional evidence of bad faith from the government, Petitioner respectfully requests the opportunity to conduct an evidentiary hearing and cross-examine the key government decision-makers in this case, including Respondent John Rathman, Respondent Carlos Rodriguez, Lisa Kaye, Hearing Officer Wombacher, Cheryl Dennings, and FDC Miami Counsel Mary Kiwanuka.

**The Bureau of Prisons Retaliates Against Nicole for Hiring Counsel**

Undersigned counsel became involved in this case on August 13, 2009, three days after Nicole's arrest.  Counsel attempted to work through BOP's legal department at FDC Miami to obtain information about the violation Nicole was being charged with and to arrange for a hair sample test at her own expense.  As outlined in the Complaint and not denied by the Respondents'[3] counsel made numerous attempts from August 24, 2009 until the date the lawsuit was filed to get the BOP to communicate with counsel and obtain information about Nicole's case.  (Compl. ¶¶ 55-73).  The BOP refused to provide any information and actually engaged in deception to undersigned counsel.  Respondent Carlos Rodriguez spoke with counsel on August 25, 2009, and refused to accommodate the request for a hair sample test.  Respondent Rodriguez could not provide a reasonable reason for denying the request.[4] (Compl. ¶ 57).

Frustrated by BOP's unwillingness to resolve the case informally, on August 26, 2009, undersigned counsel sent a long email to BOP's legal department, including BOP attorney Elizabeth Garcia, formally asserting all of Nicole's Constitutional rights and regulatory rights under the Code of Federal Regulations.  (Compl. ¶ 60).  Among other things, the email requested that Nicole be provided with a copy of the laboratory report, that Nicole be permitted to call witnesses at her DHO hearing, that the DHO hearing be postponed for a few days to allow her to prepare her defense and get her hair sample tested, and that she be able to have counsel present. (Compl. ¶ 60).

After this email was sent at 7:06 pm, Nicole was immediately taken out of the general prison population and placed in solitary confinement, also known as the "SHU."  (Order at 1). She was not permitted to contact her attorney and she had her legal papers taken from her. (Order at 1).  The very next morning, the BOP held Nicole's DHO hearing, despite the fact that counsel had been in communication with BOP's legal department about this hearing.  Through discovery, Petitioner found that Lisa Kaye, a BOP employee in the legal department who was copied on the August 26, 2009 email, wrote on the request for the DHO hearing that it be

---

[3] Respondents never filed an answer or a motion to dismiss the Complaint, therefore the Court can deem all facts alleged as admitted.  In any event, Respondents have never challenged or denied any of the allegations.

[4] Karen Bredesen testified in her deposition that Respondent Rodriguez was the individual responsible for having Nicole arrested and that it was his mistake that led to her arrest and punishment.  It is clear that Respondent Rodriguez was interested in ensuring his conduct did not come to light.

conducted "ASAP." (DE # 26, Exh. C). In fact, Ms. Kaye had pre-signed for Nicole the sections of the form having Nicole waive her rights to a defense and to present evidence, and she had Nicole sign the form while Nicole was handcuffed. 10/7/09 Hearing Trans. DE # 29 at 10. Clearly, BOP officials thought that by getting Nicole to sign the paperwork and cutting her attorney out of the process, they could get her found guilty in a way she could not later challenge. In fact, at the October 7, 2009 hearing, the U.S. Attorney's Office raised that very same bad faith argument that Nicole waived her rights at the hearing. 10/7/2009 Hearing Tr. at 19. Of course, Nicole was found guilty of the violation by the DHO, who set her new release date for January 31, 2011.

**BOP Personnel Lie to Undersigned Counsel About Nicole's Hearing**

Even more shocking than this retaliatory conduct and lack of respect for due process, BOP officials deliberately misled undersigned counsel about Nicole's DHO hearing. Nicole was unable to contact undersigned counsel after she was placed in the SHU, and counsel did not hear from her for a number of days. Four days after Nicole was found guilty of the violation at the sham DHO hearing, Lisa Kaye sent counsel an email formally denying the hair sample test and stating, "Ms. Defontes will have to complete the Administrative Remedy procedures within the Bureau of Prisons **if she is found to have committed the prohibited act.**" (emphasis added). (Compl. ¶ 70). Ms. Kaye obviously knew Nicole had her hearing four days before because Ms. Kaye was present and had ordered the hearing "ASAP." Ms. Kaye sent a follow-up email later that day confirming she had spoken to the "legal department" and that they were passing the buck back to Respondent Carlos Rodriguez. (Compl. ¶ 71). At no time did anyone at BOP inform counsel that his client had already had her hearing and been found guilty and that his attempts to get her hair sample tested were futile and moot at that point. BOP's deceptive communications with counsel were identified by this Court as examples of "particularly egregious" conduct. (Order at 4).

**The U.S. Attorney's Office Refuses to Productively Discuss the Case Prior to Petitioner Filing Her Lawsuit**

Having gotten the runaround from the BOP, undersigned counsel gave the U.S. Attorney's Office in Miami a chance to try to avoid the time and expense of protracted litigation. Undersigned counsel spoke to then-First Assistant Bob Senior. Mr. Senior referred undersigned counsel to the Chief of the Civil Division, Wendy Jacobus. Undersigned counsel spoke to Ms.

Jacobus at length about the facts of the case.  Ms. Jacobus went so far as to thank undersigned counsel for the courtesy of contacting them before filing the lawsuit:

> **From:** Jacobus, Wendy (USAFLS) [mailto:Wendy.Jacobus@usdoj.gov]
> **Sent:** Tuesday, September 01, 2009 4:10 PM
> **To:** Fridman, Daniel S (MIA - X27412); Kessler, Amanda A. (USAFLS)
> **Subject:** RE: DEFONTES, Nicole, Reg. No. 24876-056 (Delegation of Authority )
>
> Dan,
>
> Thank you for giving us the opportunity to look into this matter before you filed suit in federal court.  I am copying AUSA Amanda Kessler on this e-mail.  Amanda will be handling this matter but I will stay in the loop.
>
> Thanks.
>
> Wendy

These gestures turned out to be hollow.  Instead of producing the laboratory report and the other documents that were requested in order to try to resolve the case, the U.S. Attorney's Office made the decision to force a lawsuit and fight it.  It was also a clear opportunity for the U.S. government to have avoided the costs of litigation and its liability for attorneys' fees and costs in this case.  The government has no one to blame but itself for failing to cooperate with counsel.

**The BOP Attempts to Move Nicole to Connecticut After the Lawsuit was Filed**

Just eleven days after the lawsuit was filed, the BOP set out to further interfere with Nicole's access to her counsel by moving her out of the district to Connecticut.  On September 21, 2009, undersigned counsel received a phone call at about 6 am from Nicole's father.  He related that Nicole had been told to pack her bags and she was being sent away back to Danbury prison in Connecticut.  The U.S. Attorneys' Office denied that she was being moved, but after undersigned counsel sent a copy to the BOP legal liaison of the Court's Order granting a writ of habeas corpus ad testificandum, the liaison confirmed in an email that she was being removed from the manifest to be moved that day.  But for counsel's efforts, Nicole would have been on a long trip back to Danbury, Connecticut and unavailable for Court proceedings.  The BOP's efforts to interfere with this lawsuit and violate Court Orders are another clear showing of bad faith.

**The U.S. Attorney's Office Frivolously Opposes Discovery and Opposes Petitioner Obtaining a Copy of the Laboratory Report**

After the case was filed, the U.S. Attorney's Office frivolously took the position that Petitioner was not entitled to *any* discovery, including the laboratory report that turned out to be the key to this whole case.  The U.S. Attorney's Office did not produce the laboratory report until September 29, 2009, just three days before the parties' initial briefs were due on October 2, 2009 and over a month after the date that undersigned counsel first contacted the BOP about this case.  It appears that the only reason those documents were produced at the last minute was because the government intended to rely on some of them at the hearing.  Fortunately, undersigned counsel had already obtained the report after sending a subpoena to the laboratory directly, over the objections of the U.S. Attorney's Office.  There is no excuse for the fact that it took the government well over one month to turn over the exculpatory document.

**Nicole's Counsel Proves that the BOP Wrongfully Convicted Nicole – Twice**

The laboratory report that the government had refused to provide to Petitioner was the key to exposing the BOP's serious mistake.  It showed that the miniscule amount of morphine detected in Nicole's urine was far below the cutoffs BOP used for reporting a positive result.  The government's own laboratory wrote a letter interpreting the results concluding that it was consistent with Nicole having eaten poppy seeds.  At the hearing, Respondents' counsel admitted the error:

> I would like to point out  that the toxicology report that was sent to the Salvation Army was actually incorrect. . . [T]hey should have sent a report to the Salvation Army letting them know that this was a negative test with none detected.

10/7/2009 Hearing Tr. at 17.  Nevertheless, even with this statement, the government still failed to take responsibility for its own failures, trying to shift blame to the Salvation Army half-way house.  Even BOP employees who were deposed refused to take responsibility for this and pointed the finger at others.  In Nicole's case, there was ample finger-pointing and a shocking lack of accountability in the way she was treated. Karen Bredesen, a senior BOP official, testified that she did nothing to verify that the incident report alleging that Nicole had used morphine was accurate and she did not review a copy of the laboratory report that showed the amount of morphine was below BOP cutoffs. (Bredesen Depo. at 22-24). In fact, Ms. Bredesen was unfamiliar with the cutoffs, despite the fact that she oversees the BOP transitional drug abuse treatment program. (Bredesen

Depo. at 26-27).  Ms. Bredesen passed the buck to Carlos Rodriguez, testifying that it was his responsibility to verify the incident report.[5]

> **Q. What steps did you take to make sure that the incident report was in fact accurate?**
> A.  I don't take any steps.  And I can tell you why.
> **Q.  Go ahead.**
> A.  Cheryl Dennings --well, actually that was after the fact so -no, I don't take any steps. The CCM office is to verify whether this report is accurate.
> **Q. So this is -- in this incident report, Exhibit 39 -**
> A.  Yes.
> **Q. --what was --tell me in your own words what the nature of the violation was.**
> A.   Using drugs.
> **Q.  And what drugs specifically?**
> A.  Morphine.
> **Q.  And how was that drug use shown?**
> A.  It's shown by a toxicology laboratory report.
> **Q.  Based on a urine test, right?**
> A.  Yes.
> **Q. Did you ask to see a copy of the toxicology laboratory report?**
> A.  No.
> **Q.  Why not?**
> A.  Because the CCM office does that.  No, I don't look at those.
> **Q.  So it's the CCM's office responsibility to do that?**
> A. To review those, yes, make sure it's accurate. Cheryl Dennings has the final say in whether or not the incident report is a good incident report or not. She sends it up and then sometimes they are expunged by the DHO for various reasons.
> **Q.  Did she review the lab report, Cheryl Dennings?**
> A.  I don't know.

Ms. Bredesen eventually conceded that based on what happened to Nicole she may change her practice and look at the laboratory reports to verify the incident reports.  (Bredesen Depo. at 38-39).

> **Q.  So what you're saying is your testimony is that it's the CCM office's responsibility to verify the incident report, that would be Carlos Rodriguez's office, right?**
> A.  That's correct.

(Bredesen Depo. at 22-24).

In fact, Ms. Bredesen went further and testified that Nicole should never have been arrested and removed from the program, and this was all Mr. Rodriguez's mistake.

**Q. … So based on this letter and this toxicology report, should Ms. DeFontes have been removed and placed under arrest?**

A. No.

**Q. Somebody made a mistake here, right?**

A. I would say yes, if they're supposed to get the toxicology report.

**Q. Was it your mistake?**

A. No.

Q. Whose mistake was it?

 A. I would say the CCM office.

 **Q. And who's the head of the CCM office?**

A. Carlos Rodriguez. . . .

**Q.   And whose decision was it to lock her up?**

A. Carlos Rodriguez.  The final decision of course is also with Cheryl Denings**. . .**

(Bredesen Depo. at 33-34, 46).

This Court found that Nicole's test "should not have registered as a 'positive'" as "the amount of opiates in the lab results was *below* the Bureau of Prisons' regulatory cutoffs."  (Order at 2) (emphasis in original).  Based on Respondents' failure to follow their own regulations regarding the threshold level of positive drug test results, Respondents "wrongfully arrested Ms. Defontes, wrongfully removed her from home confinement, and wrongfully imprisoned her for two months at FDC-Miami (including seventeen days in solitary confinement)." (*Id.* at 4).

Discovery has shown that the BOP's hearing process is a sham.  No one bothered to verify that Nicole was being charged correctly with a violation, even though several people including, Carlos Rodriguez, Karen Bredesen, John Rathman, and the DHO Hearing Officer Wombacher had the responsibility to do so.  This is all particularly egregious considering that Nicole was represented by counsel who was trying to get a copy of the report to review it himself.

**The BOP Abruptly Releases Nicole and Orders Her Back to the Same Half-Way House that Had Misreported Her Test Result and Held the UDC Hearing *In Absentia***

The day before the October 7, 2009 hearing, the BOP abruptly released Nicole and tried to cancel the hearing.  The BOP realized that it had been caught committing a serious error and did not want to face the Court to explain itself.  In a further show of bad faith, the BOP compounded the problem by sending Nicole back to the very same half-way house that had

misreported her drug test results.  The BOP made Nicole find her own transportation back from FDC Miami to the West Palm Beach half-way house.  When she got there, the first thing they did was attempt to drug test her.  When she asked for a split-sample, something one of our experts had recommended, Respondent Carlos Rodriguez got on the phone and denied the request and asked that her father be prevented from observing the sample.  10/7/2009 Hearing Tr. at 13- 16, 21-22.  It is likely the BOP was putting her in this situation to set her up again.  Fortunately, the Court saw through this and ordered Nicole transferred to the custody of U.S. Probation.

**The U.S. Attorney's Office Surprises Counsel at the October 7, 2009 Hearing with Documents It Had Not Produced**

The government took the position before the hearing that Petitioner was not entitled to discovery despite the fact that Petitioner had requested all documents relating to her case. Nevertheless, at the hearing, the U.S. Attorney's Office used two documents it had not produced to Nicole before the hearing in order to try to defend itself.  10/7/2009 Hearing Tr. at 16-17. This is yet another example of the lack of respect the government had for the judicial process in this case.

**The Government Multiplies the Costs of this Proceeding by Filing a Frivolous Motion for Reconsideration Relying on a Bad Faith Argument to Harass Nicole**

This case should have ended when the Court transferred Nicole to the custody of U.S. Probation on October 7, 2009.  The BOP's own records reflected that Nicole was scheduled to be released on November 8, 2009, just a month after the hearing.  By the time the government filed its Motion for Reconsideration on October 20, 2009, Nicole had just 16 days left under their calculations (she would have been released before the weekend on November 6, 2009).  To avoid the argument that their motion was mooted by the passage of those 16 days while the motion was briefed and decided, the government came up with an argument that is the epitome of bad faith and disingenuousness.  The government argued that because Nicole had been wrongfully imprisoned by them for two months, she did not attend four individual and four group drug counseling sessions.  Therefore, the government reasoned, she failed the drug treatment program and did not earn her year off her sentence.  The U.S. Attorney's Office attached affidavits to the motion for reconsideration purportedly supporting its "position."  In essence, the government was trying to punish Nicole for its own mistakes.  But it got worse from there.

Discovery confirmed that the government's argument was purely pretextual and was invented to support its decision to continue to fight this case and increase the costs on the Petitioner. Karen Bredesen is in charge of the Transitional Drug Abuse Treatment program in the Southeastern Region for the BOP. She is the immediate supervisor of Karen Donovan, the BOP employee that submitted an affidavit for the Motion for Reconsideration. Bredesen admitted in her deposition that the amount of drug counseling sessions required of inmates in the program is discretionary and "tailored individually to the inmate's needs." (DE # 29, Ex. A, Bredesen Depo. at 79-80). If the inmate is doing well, then Bredesen can cut the number of group and individual sessions. (Bredesen Depo. at 81). Bredensen testified that based on Nicole's progress reports, Nicole was "good, compliant, willing participant. . . very good" and "no red flags that would lead me to think she was going to relapse." (Bredesen Depo. at 90).

Elise Powell was Nicole's individual counselor at PEC, Inc., the government contractor that provides drug treatment services for the BOP. (Bredesen Depo. at 84). As the ultimate proof of the government's bad faith, Bredesen admitted that she did not even speak to Nicole's counselor, Elise Powell, before she authorized the preparation of the affidavit submitted to this Court claiming that Nicole needs four individual and four group counseling sessions. (Bredesen Depo. at 80). Had Bredesen spoken to Elise Powell, she would have learned that Ms. Powell, the government's counselor, does not believe that Nicole needs any more counseling sessions at all.

As part of the BOP's drug treatment program, Nicole began drug abuse counseling at PEC, Inc. on May 21, 2009. (DE # 38, Ex E, Decl. of Elise Powell at ¶ 15). Nicole's. individual counselor was Elise Powell, a licensed mental health counselor. (Ex. E at ¶¶ 2, 5, 18, 20). Ms. Powell has worked at PEC, Inc. since 2000 and runs the TDAT program on BOP's behalf. (Ex. E at ¶¶ 5, 7, 8). She is the main point of contact with the BOP. (Ex. E at ¶8). Ms. Powell reviewed the BOP's affidavit and met with Nicole personally. Ms. Powell disagreed that Nicole was in need of any further counseling sessions, stating:

> **"Based on my experience and training, and on my interactions with Nicole, I believe the additional counseling sessions described by the BOP in the affidavit of Karen Donovan would not be beneficial at this point and would be a waste of time and money."** (Ex. E at ¶ 28).

Ms. Powell stated that no one at BOP consulted her before deciding that Nicole needed to complete four more group counseling sessions and four more individual counseling sessions.

(Ex. E at ¶ 27).  In fact, Ms. Powell disagreed with this assessment.  (Ex. E at ¶ 27).  In light of Nicole's excellent progress while at PEC, Inc., her continued employment at The Treatment Center, her completion of the CARP program, and her success in remaining drug free for over five years, Ms. Powell did not think Nicole needed any further counseling.  (Ex. E at ¶¶ 22, 24-28).  On the contrary, as Nicole's individual counselor and the only person in the TDAT program who has dealt with Nicole, Ms. Powell expressed her professional opinion that Nicole "needs to get all of this behind her and needs to focus on her career and her family." (*See* Ex. E at ¶¶ 29).  Bredesen did not consult with Nicole's counselor nor did she try to speak to Nicole herself.  (Bredesen Depo. at 80).  Nicole has been drug-free for over five years, including nearly one whole year living outside the prison.  She completed a twelve-week drug program at the direction of the U.S. Probation Office.  The BOP's own drug treatment counselor did not recommend any further counseling sessions.  The BOP's position that Nicole failed the drug treatment program because they did not give her any drug treatment while she was imprisoned at FDC Miami was contrived, invented, and in bad faith.  It was also designed to harass Nicole by keeping the case and her potential return to BOP custody alive.[5]

**The U.S. Attorney's Office Simply Ignored Petitioner's First Request for Production and Did Not Even Bother to Serve Objections**

To defend against the meritless Motion for Reconsideration, Nicole renewed her requests for discovery.  The government failed to respond at all (not even serving objections) to the First Request for Production and when undersigned counsel called the U.S. Attorney's Office to discuss their failure to produce documents, they opposed producing any further documentation.  Petitioner was forced to go through the time and expense to file a Motion to Compel (DE # 18) which this Court granted (DE # 33).  Later, the government continued in its pattern of opposing discovery at all costs by filing a Motion for Protective Order (DE # 28) to prevent the deposition of Respondent Carlos Rodriguez and his ultimate supervisor, Cheryl Dennings.  The U.S. Attorney's Office displayed a continuing pattern of needlessly opposing discovery, which was particularly illustrative of bad faith because the U.S. Attorney's Office decided to extend the case by nearly a year through its Motion for Reconsideration.

---

[5] The final nail in the coffin for the government's argument is in a document that was produced after the deposition of Karen Bredesen.  In that memorandum she wrote that Nicole was not a TDAT failure because she was released by the Court.  Apparently, after the memorandum was written, the government decided she was a TDAT failure to support its position in this litigation.

**The U.S. Attorney's Office is Just as Culpable as the BOP**

It is clear that the BOP tried every step of the way to cover up its Constitutional violations, negligence, incompetence, and retaliatory acts, but the U.S. Attorney's Office went right along with it.  Every lawyer has a duty to tell his or her client when the client is pursuing a frivolous position or acting in bad faith, and if the client insists, it is that lawyer's duty to refuse to engage in that conduct.  *See* Rules Regulating the Florida Bar, Rules 4-3.1 to 4-3.4.  It is particularly troubling that this conduct was not from a private attorney, but from the U.S. Department of Justice, an institution that is charged with doing justice, not with winning every case.  We had a chance to resolve this case before it was even filed, and the U.S. Attorney's Office rejected it.  There has been a serious failure in management and leadership in the handling of this case, and the imposition of attorneys' fees and costs against both the BOP and the attorneys involved at the U.S. Attorney's Office will serve to deter future oppressive and bad faith conduct by both the BOP and the U.S. Attorney's Office.

## LEGAL ARGUMENT

**I.     THE EQUAL ACCESS TO JUSTICE ACT ENTITLES THE PETITIONER TO RECOVER FROM RESPONDENTS HER ATTORNEY'S FEES AND COSTS.**

The Equal Access to Justice Act ("EAJA") waives sovereign immunity by allowing the assessment of attorneys' fees and costs against the United States.  *Maritime Mgmt., Inc. v. United States*, 242 F.3d 1326, 1336 (11th Cir. 2001).[6]  In 1981 Congress enacted the Equal Access to Justice Act, amending 28 U.S.C. § 2412 to give district courts the discretion to award attorneys' fees. Pub.L. No. 96-481, § 204, 94 Stat. 2325 et seq. (codified as amended at 5 U.S.C.A. § 504 and 28 U.S.C.A. § 2412). The primary purpose of the EAJA is "to ensure that [private parties] will not be deterred from seeking review of, or defending against, unjustified governmental action because of the expense involved in securing the vindication of their rights." H.R. Rep. No. 99-120, at 4 (1985), reprinted in 1985 U.S.C.C.A.N. 132, 132-33. Congress also anticipated that the EAJA would discourage federal agencies from taking frivolous positions. See *Miles v. Bowen*, 632 F. Supp. 282, 283 (M.D. Ala. 1986).

The statutory framework of 28 U.S.C. § 2412 contains two parallel provisions for awarding attorneys' fees to plaintiffs that prevail in civil suits against the United States.  The first

---

[6]   The Eleventh Circuit's decision in *Maritime Mgmt.* provides an excellent roadmap for the Court of the legal framework of the EAJA.  The legal standard that follows is quoted directly from that case.

of these, § 2412(b), waives sovereign immunity by making the United States liable for fees "to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award." 28 U.S.C. § 2412(b).  Because of this provision the equitable exceptions to the American Rule apply to the federal government in the same manner as they apply to private litigants. *Panola Land Buying Ass'n v. Clark*, 844 F.2d 1506, 1510 (11th Cir.1988).   This makes an award of fees proper under common fund and common benefit theories, as well as in situations where the government has acted "in bad faith, vexatiously, wantonly, or for oppressive reasons" in its conduct of litigation. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258 (1975); *see also* 10 James Wm. Moore et al, Moore's Federal Practice § 54.172[1][b] (3d ed. 1999) (describing equitable exceptions to American Rule as common fund, common benefit, and bad faith).   The award of fees under § 2412(b) is discretionary.

Section 2412(d) provides an alternative vehicle for an award of fees to plaintiffs who have prevailed in non-tort suits against the United States.  Statutorily and conceptually distinct from its § 2412 counterpart, subsection (d) was revived by congressional amendment in 1985 after having lapsed under the original statute's sunset provision. *See* Pub.L. 99-80, § 6, 99 Stat. 186 (codified at 28 U.S.C. § 2412(d)).  Unlike § 2412(b), which is not limited in this respect, § 2412(d) requires parties to qualify under statutorily prescribed net worth maximums. *See* 28 U.S.C. § 2412(d)(1)(C)(2)(B) (defining "party" for purposes of subsection (d) by net worth);[7] *Panola Land Buying Ass'n*, 844 F.2d at 1510 (differentiating subsections).

Also, where § 2412(b) is discretionary, § 2412(d) is mandatory; the assessment of fees in favor of an eligible prevailing party and against the government is obligatory under subsection (d) unless "the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." 28 U.S.C. § 2412(d)(1)(A).  Another difference in keeping with the discretionary distinction between §§ 2412(b) and (d) is that under the former subsection, fees are awarded at a rate determined by the district court, whereas under the latter, awards are subject to a statutory cap. *See* 28 U.S.C. § 2412(d)(2)(A) (listing presumptive cap of $125 per hour); *Cazares v. Barber*, 959 F.2d 753, 755 (9th Cir.1992) (noting award under § 2412(b) is not subject to fee cap of § 2412(d)(2)(A)).

---

[7] Nicole's net worth falls below the net worth threshold in the statute, which requires  "an individual whose net worth did not exceed $2,000,000 at the time the civil action was filed."

Under both the Section 2412(b) and 2412(d) standards, Petitioner qualifies for an award of all her attorney's fees and costs incurred in this case because the government has litigated in bad faith and its positions in this case were not substantially justified. Both 2412(b) and (d) require: (1) that Nicole be a prevailing party, and (2) that the case was a civil action against the United States or any agency or any official of the United States acting in his or her official capacity.

A.      Nicole Michelle Defontes is a "prevailing party" under the EAJA.

The threshold requirement for awarding attorney's fees under the EAJA is that the litigant be a "prevailing party."   *See* 28 U.S.C. § 2412.   The Eleventh Circuit has held that the appropriate inquiry to determine whether a litigant is a prevailing party is "'whether he or she has received substantially the relief requested or has been successful on the central issue,' or, stated another way, whether 'plaintiffs' lawsuit was a catalyst motivating defendants to provide the primary relief sought in a manner desired by litigation.'"   *Jean v. Nelson*, 863 F.2d 759, 765 (11th Cir. 1988), *cert. granted*, 493 U.S. 1055 (1990) *and judgment aff'd*, 496 U.S. 154 (1990) (quoting W*atkins v. Mobile Housing Bd.*, 632 F.2d 565, 567 (5th Cir. 1980)); *Robinson v. Kimbrough*, 652 F.2d 458, 465 (5th Cir. 1981)).   Additionally, "the Supreme Court has made clear that a plaintiff is 'prevailing' if he proves 'his entitlement to *some* relief on the *merits* of his claims, either in the trial court or on appeal.'"   *Jean*, 863 F.2d at 766 (quoting *Hanrahan v. Hampton*, 446 U.S. 754, 757 (1980)) (emphasis in original).

It is obvious that Nicole is the prevailing party in this case.   Nicole sought review of Respondents' violations of her Constitutional and procedural due process rights by asserting that the BOP had violated its own rules in denying her the right to present evidence in her defense and in finding her guilty of using illegal drugs.   This Court, recognizing the "egregious actions" taken by Respondents, granted Nicole all the relief she requested and went further by removing her from BOP custody entirely and crafting a remedy "to satisfy both justice and law."   (Order at 7).   The Court has already found that Nicole is the prevailing party and noted it in its Order, writing: "[i]n Reviewing the Petition for Writ of Habeas Corpus (ECF No. 1), it appears that all relief sought by the Petitioner has been granted or is now moot."   For all these reasons, Nicole is a prevailing party under the EAJA.

**B.**     **Nicole's Petition for Writ of Habeas Corpus and Writ of Mandamus is a "civil action" under the EAJA.**

**1.**     **Counts 1 through 5, Nicole's primary claims against the Respondents seeking judicial review of agency action and mandamus relief, qualify as a "civil action" under the EAJA.**

This case was a "civil action" as used in Section 2412 of the EAJA. It is well-established that an action challenging Constitutional procedural due process violations by an administrative agency is a "civil action" under the EAJA. *Cox v. United States*, 593 F. Supp. 1238, 1240 (S.D. Fla. 1984) (awarding fees under EAJA upon finding procedural due process violations in executing IRS levy); *Floroiu v. Gonzales*, 498 F.3d 746, 748 (7th Cir. 2007) (awarding fees under EAJA after concluding that INS judge manifested a clear bias against the petitioners amounting to a deprivation of due process of law); *United States v. Marolf*, 277 F.3d 1156, 1159 (9th Cir. 2002) (awarding attorneys' fees under EAJA where DEA violated claimants due process rights in instituting a procedurally defective forfeiture against claimant's property); *Yang v. Shalala*, 22 F.3d 213, 217 (9th Cir. 1994) (affirming award of fees against Health and Human Services Secretary where the Secretary violated claimant's due process rights by not making the determination based on evidence adduced at the hearing). In fact, the Eleventh Circuit has specifically stated that in the context of the EAJA "the words 'civil action' include proceedings for judicial review of agency action." *Maritime Mgmt., Inc. v. United States*, 242 F.3d 1326, 1336 (11th Cir. 2001).

The core of Nicole's claims were in Counts 1 through 5, where she sought judicial review of the administrative procedures employed by the BOP against her. In Counts 1 through 5, Nicole was not asking for habeas corpus relief; to the contrary, Nicole asked that the Court void the BOP's administrative decisions and order the BOP under the Court's mandamus power to hold a new hearing for her that respected her due process rights. The Eleventh Circuit has held that EAJA awards can be based on litigants' success on claims made under a writ of mandamus pursuant to 28 U.S.C. § 1361. *Abdelgalel v. Holder*, No. 10-10680, 2010 WL 3794650, at *7 (11th Cir. Sept. 30, 2010) (finding that litigant was prevailing party in civil action under EAJA where court granted alien's request for a writ of mandamus and directed the United States Citizenship and Immigration Services (USCIS) to adjudicate his naturalization application within

a specific, narrow period of time).  This was the same vehicle used by Nicole to challenge the administrative violations by the BOP.

In its Order on September 30, 2010, the Court agreed with the core allegations Nicole made in Counts 1 through 5 of her Complaint, finding that the BOP failed to follow its own rules and committed apparent Constitutional violations.  In accordance with similar cases awarding EAJA fees and costs in procedural due process and mandamus cases reviewing agency actions, this case qualifies as a "civil action" for purposes of the EAJA.

> ### 2.   Count 6, Nicole's request for a writ of habeas corpus ad testificandum, qualifies as a "civil action" under the EAJA.

Count 6 sought a writ of habeas corpus ad testificandum so that the Court could ensure that Nicole remained in the district while the case was pending.  The Court granted the habeas relief sought in Count 6 early in the case on September 21, 2009.  The Eleventh Circuit has not directly addressed whether the portion of a civil action seeking habeas corpus relief is a "civil action" for purposes of the EAJA.

Both the U.S. Supreme Court and the Eleventh Circuit have recognized that habeas corpus is a civil proceeding.  *Browder v. Baker*, 434 U.S. 257, 269 (1978); *Fisher v. Baker*, 203 U.S. 174, 181 (1906); *Harris v. Nelson*, 394 U.S. 286 (1959); *Dickson v. Wainwright*, 683 F.2d 348, 352 (11th Cir. 1982) ("Habeas corpus is a civil proceeding. . . "). However, the Eleventh Circuit has not specifically addressed the applicability of the EAJA to habeas corpus decisions.

Only three circuits have considered whether petitioners in purely criminal habeas corpus proceeding are entitled to fees and costs under the EAJA.  *See Ewing v. Rodgers*, 826 F.2d 967, 968 (10th Cir. 1987); *Boudin v. Thomas*, 732 F.2d 1107, 1115 (2d Cir. 1984); *O'Brien v. Moore*, 395 F.3d 499, 505 (4th Cir 2005).  In those cases, the circuit courts declined to award fees in purely criminal habeas cases.  The rationale behind the decisions of those courts rested upon the fact that the petitioners were seeking release from a purely criminal detention, a traditional role of the Court's habeas jurisdiction.  For example, the Fourth Circuit, in denying a fee award under EAJA after a successful habeas petition, noted that "to the extent that a habeas proceeding reviews a criminal punishment with the potential of overturning it, the habeas proceeding necessarily assumes part of the underlying case's criminal nature."  *O'Brien*, 395 F.3d at 505.

These cases do not apply to Nicole's case.  The critical distinction in each of these three circuit court cases was the fact that the petitioner sought immediate release from custody,

something Nicole did not seek in her Petition.  This was not a habeas case where Nicole was attacking her conviction for ineffective assistance of counsel or seeking to be immediately released from custody.  A request for Nicole's immediate release from custody is not referenced anywhere in her Petition.  The habeas portion of Nicole's Petition was, in essence, in aid of the court's jurisdiction over her for purposes of her civil case.  It did not seek her immediate release, it only sought for her to remain in the district.

Nicole's case was a Constitutional and administrative challenge to the BOP's procedures seeking a mandamus order from the Court to the BOP.  That is clearly a civil case, and the Second Circuit in *Boudin* is consistent with that position.  The Second Circuit in *Boudin* recognized that where a petition contains both habeas and non-habeas claims, EAJA fees may be awarded for the claims that did not seek habeas relief.  In *Boudin*, the habeas petitioner sought immediate release from solitary confinement and a return to the general prison population. *Boudin*, 732 F.2d at 1109-10.  The petitioner also sought "an injunction ordering prison authorities to allow her to have contact visits with her infant son." *Id.* at 1115.  The district court had granted the injunction on the ground that Boudin had a First Amendment right to contact visits.  *Id.*  The Second Circuit held that "[t]he part of her complaint seeking this relief [the injunction] is without question a civil action for purposes of the EAJA." *Id.* (citing *Preiser v. Rodriguez,* 411 U.S. 475 (1973) (claim exclusively cognizable under federal habeas corpus may be litigated simultaneously with federal civil rights claims)).  Similarly, the heart of Nicole's Petition was focused on seeking mandamus relief after proving violations of Fifth Amendment Constitutional due process rights and BOP regulations.[8]

The habeas portion of the Complaint in Count 6 was a very minor part of the case intended to assist the Court in preserving its jurisdiction over Nicole and securing her access to her attorney.  Indeed, the Ninth Circuit has noted that a court "must look to the substance of the remedy sought, not the labels attached to the claim, in determining whether a proceeding falls within the term 'any civil action' of the EAJA." *Petition of Hill*, 775 F.2d 1037, 1041 (9th Cir. 1985).  Here, the remedy sought was a vindication of Nicole's procedural due process rights and a mandamus order requiring the BOP to permit Nicole to cut a sample of her hair for

---

[8] *See Bell v. Wolfish*, 441 U.S. 520,  526-27 n. 6 (1979) (claim entertained as implied right of action based on Fifth Amendment); *Boudin v. Thomas*, 737 F.2d 261 (2d Cir. 1984).

independent drug testing and to hold a new administrative disciplinary hearing for Nicole that observed those rights.

This case is unusual because the Court went beyond the mandamus relief that was requested by the Petitioner and granted habeas relief in ordering that Nicole be transferred from BOP custody to the custody of U.S. Probation.  As the Court noted in its Order, "[t]his case presents a unique set of facts, which do not line up with the 'typical' habeas corpus case."  Order at 7.  The Court found that the government had engaged in "egregious actions" and that "the only way to safeguard Ms. Defontes from repeated offenses was to transfer her from the custody of the Bureau of Prisons to the custody of the U.S. Probation Office." Order at 2.  This was the relief that the Court fashioned – "an equitable remedy that satisfied both the law and justice." Order at 6.  However, when analyzing whether the action itself was a civil action or a habeas action, we must look to the relief that was requested by the Petitioner, not the relief that the Court eventually fashioned.  *See*, *e.g.*, *Hill*, 775 F.2d at 1041.

**C.**     **Nicole is entitled to attorney's fees and costs under Section 2412(b) of the EAJA for the Respondents' bad faith conduct in this case.**

Section 2412(b) of the EAJA waives sovereign immunity by making the United States liable for fees "to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award."  *Maritime Mgmt., Inc. v. United States*, 242 F.3d 1326, 1331 (11th Cir. 2001).  Because of this provision the equitable exceptions to the American Rule apply to the federal government in the same manner as they apply to private litigants.  *Panola Land Buying Ass'n v. Clark*, 844 F.2d 1506, 1510 (11th Cir. 1988).  This makes an award of fees proper under common fund and common benefit theories as well as in situations where the government has acted 'in bad faith, vexatiously, wantonly, or for oppressive reasons' in its conduct of litigation.   The EAJA allows courts to use their inherent power to assess attorneys' fees when the government has acted in bad faith. The bad faith exception to the American Rule is not limited to suits that are filed in bad faith; the exception also encompasses bad faith acts preceding and during litigation. *Kreager v. Solomon and Flanagan*, 775 F.2d 1541, 1543 (11th Cir. 1985) (citing Roadway Express, Inc. v. Piper, 447 U.S. 752, 765-66 (1980)). In determining the propriety of a bad faith fee award, "the inquiry will focus primarily on the conduct and motive of a party, rather than on the validity of the case." *Rothenberg v. Security Mgmt. Co.*, 736 F.2d 1470, 1472 (11th Cir.1984) (citation omitted).  *Id.*

Additionally, unlike other provisions of the EAJA, awards under section 2412(b) are not subject to a statutory cap.  *Id.* at 1332.

The "liable under the common law" provision has been interpreted to allow awards of attorney fees at market rates in cases involving "bad faith" by the United States or an agency of the United States.  *See Id.*; *Brown v. Sullivan*, 916 F.2d 492, 495 (9th Cir. 1990).  This is because, as the Supreme Court has recognized, attorneys' fees may be assessed against a losing party which has acted in "bad faith, vexatiously, wantonly or for oppressive reasons."  *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240 (1975).  Accordingly, under the EAJA "courts can use their inherent power to assess attorneys' fees when the *government* has acted in bad faith."  *Maritime*, 242 F.3d at 1333 (emphasis added).

A finding of bad faith is warranted where an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent.  *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998).  A party also demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court order.  *Id*.  Indeed, as another court in this district reasoned:

> Bad faith can be established: (1) on the losing party's conduct of the litigation and the merit of its claims or litigation position when the court finds both that the losing party's claims were entirely frivolous, unreasonable or groundless and made for reasons of harassment or delay; or (2) on the conduct giving rise to the legal controversy when a party confronted with a clear legal duty is so recalcitrant in performing that duty that the injured party is forced to resort to litigation to vindicate his rights.

*United States v. Bachner*, 877 F. Supp. 625, 628 (S.D. Fla. 1995).

Numerous courts have awarded attorneys fees and costs under section 2412(b) of the EAJA upon finding bad faith by the government or its agency.  *See, e.g., Maritime*, 242 F.3d at 1335; *Bachner*, 877 F. Supp at 628; *Brown*, 916 F.2d at 496; *Mendenhall v. Nat'l Transp. Safety Bd.*, 92 F.3d 871, 877 (9th Cir. 1996).  Indeed, the Court in *Bachner* found "bad faith" and awarded attorneys' fees and costs under the EAJA upon finding "egregious" conduct by a government agency. *Bachner*, 877 F. Supp at 628 (finding bad faith where government exhibited "egregious" conduct in forfeiture proceedings).  In doing so, these courts have examined the conduct and motive of the government rather than just the validity of the case.  *Maritime*, 242 F.3d at 1333 (citing *Rothenberg v. Sec. Mgmt. Co.*, 736 F.2d 1470, 1472 (11th Cir. 1984)).

For example, in *Brown v. Sullivan*, the Ninth Circuit awarded attorney's fees under the EAJA after finding bad faith conduct where the Secretary of Health and Human Services "created delays and necessitated [the litigant's] filing the first action in the district court." In doing so, the court noted that the agency's failure to provide the party with documents in its possession forced her to endure unnecessary delays. *Id.* The court further rejected the government's argument that the delays were "mistakes or administrative errors understandably committed as a result of the agency's vast size and complex system." *Id.*

For all the reasons outlined above in the Factual Background section, the government has engaged in bad faith conduct throughout this litigation, making the award of EAJA fees and costs appropriate. The government engaged in bad faith and vexatious conduct by: 1) holding a UDC hearing without Nicole present, 2) retaliating against Nicole by putting her in solitary after her attorney began asserting her rights, 3) denying Nicole access to her attorney, 4) holding a DHO hearing where Nicole was provided with prefilled paperwork waiving her rights to try to prejudice her case, 5) lying to Nicole's counsel about the fact that the DHO hearing had been held, 6) failing to communicate at all with Nicole's counsel in a productive, good faith manner, 7) forcing Nicole to file a lawsuit despite the fact that she gave the U.S. Attorney's Office the chance to resolve it, 8) attempting to move Nicole out of the district in violation of the Court's habeas corpus ad testificandum order to try to interfere with the case and her access to her counsel, 9) frivolously opposing Nicole's discovery requests, including refusing to provide her with a copy of the laboratory report for over a month but producing surprise documents at the hearing, 10) finding Nicole guilty of the drug violation even though it fell below the cutoff, 11) failing to take responsibility for the BOP's mistakes, 12) abruptly releasing Nicole and sending her back to the same half-way house that made the error in the drug testing and held her UDC hearing in absentia, 13) filing a frivolous motion for reconsideration that was based on a bad faith and pretextual premise that dragged the case out for an extra year, 14) ignoring entirely Petitioner's First Request for Production and opposing the motion to compel, and 15) failing in their ethical duty as attorneys to advise the BOP that their litigation position was in bad faith and frivolous. Accordingly, an award of attorneys' fees and costs is more than warranted in this case.

### D.     Nicole is entitled to attorney's fees and costs under Section 2412(d) of the EAJA because the government's position was not substantially justified.

Nicole is also entitled to an award for attorneys' fees and costs under section 2412(d)(1)(a).  That section provides in pertinent part that:

> a court shall award to a prevailing party ... fees and other expenses, ... incurred by that party in any civil action, ... brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(a).  Accordingly, to award fees under 2412(d), a court must find that the position of the government was not substantially justified nor do special circumstances make an award unjust.  Because the Respondents' actions were not substantially justified, Nicole Michelle Defontes is entitled to recover her costs and reasonable attorneys' fees pursuant to Section 2412(d)(1)(a).

As discussed in the previous section, Nicole was a prevailing party in a civil suit against the government.  In addition, it is evident that the position of Respondents in this case was not substantially justified.  To be substantially justified, "the United States' position must have a "reasonable basis both in law and fact."  *Jean*, 863 F.2d at 767; *Pierce v. Underwood*,  487 U.S. 552, 565 (1988) (concluding that "substantially justified" means the position is "justified in substance or in the main-that is, justified to a degree that could satisfy a reasonable person" or "reasonable basis both in law and fact").  In addition, the burden of proving substantial justification or special circumstances is on the government.  *Id.*; *see U.S. v. Real Prop. At 2569 Roundhill Drive*, 283 F.3d 1146 (9th Cir. 2002); *U.S. v. Hallmark Const. Co.*, 200 F.3d 1076 (7th Cir. 2000); *Moseanko v. Yeutter*, 944 F.2d 418 (8th Cir. 1991).

An agency's violation of its own policy or regulations may provide a basis for a finding of lack of substantial justification.  *See Meinhold v. U.S. Dept. of Defense*, 123 F.3d 1275, 1278 (9th Cir. 1997), *opinion amended on other grounds*, 131 F.3d 842 (9th Cir. 1997); *Mendenhall v. Nat'l Transp. Safety Bd.*, 92 F.3d 871 (9th Cir. 2006).  In fact, if the government's position violates the Constitution, a statute, or its own regulations, a finding that the government was substantially justified would be an abuse of discretion.  *Mendenhall*, 92 F.3d at 874.

Here, the Bureau of Prisons, ignoring their own regulations and procedures regarding positive drug test results, wrongfully arrested Nicole and wrongfully imprisoned her for two

months.  (ECF 41 at 4).  Further violating their own regulations, as well as constitutional and statutory requirements, Respondents then conducted an administrative proceeding without allowing Nicole to present any evidence or even speak to her attorney.  These actions were taken as a direct result of an improperly analyzed drug test and complete disregard for regulation and procedure.  Thus, it is evident that there was no basis in law or fact for the actions taken by Respondents.

Additionally, while normally, under subsection (d) of the EAJA, attorney's fees may not be awarded at a rate greater than $125 per hour, fees departing from this cap may be awarded where "a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee."  28 U.S.C. § 2412(d)(2)(a).  Here, a departure is justified as there is a limited availability of qualified attorneys for the proceedings involved.  Indeed, the Court recognized that it was solely because Nicole "had the means and resources to hire skilled attorneys" that she is not still wrongfully incarcerated.  (ECF 41 at 5).  This case involved "unique factual circumstances" and accordingly the award of fees should be based on reasonable market rates.  (*See id.* at 6).

Moreover, bad faith has been held to constitute a "special factor" for purposes of the EAJA, and when found, courts have awarded fees based on reasonable market rates.  *Jean*, 863 F.2d at 776 n. 13 (stating that "if the government...advanced litigation for any improper purpose such as harassment, unnecessary delay or increase in the plaintiffs' expense, then…its action warrants the imposition of a special factor."); *Mendenhall*, 92 F.3d at 876-77 (finding bad faith and awarding market rate fees based on "agency's continuation of an action it knew to be baseless"); *Brown v. Sullivan*, 916 F.2d 492 (9th Cir. 1990) (noting that disregard of the judicial process is a "hallmark of bad faith") (citations omitted); *Hyatt v. Shalala*, 6 F.3d 250 (4th Cir. 1993) (finding bad faith and awarding reasonable market rate where the government's position was "not even marginally justifiable").

In this case, it is apparent in the Order that the Court has found sufficient facts to justify a departure from the fee cap based on bad faith.  Specifically, this Court found that based on the Bureau of Prisons "egregious actions" and "failure to follow its own policy" Nicole was subjected to "blatant constitutional violations" and wrongfully arrested, wrongfully removed from home confinement and wrongfully imprisoned for two months.  (ECF 41 at 2-4).  The Court also acknowledged that Nicole presented "credible allegations of misconduct and

retaliation." (*Id.* at 2). These factual findings highlight the government's bad faith conduct, and thus a departure from the traditional fee cap is warranted.

## II.   RESPONDENTS' COUNSEL HAS UNREASONABLY MULTIPLIED THESE PROCEEDINGS AND SHOULD BE SANCTIONED UNDER 28 U.S.C. § 1927.

The Court has authority to impose sanctions against an attorney under 28 U.S.C. § 1927. The Eleventh Circuit has recognized that the "district court's authority to issue sanctions for attorney misconduct under § 1927 is either broader than or equally as broad as the district court's authority to issue a sanctions order under its inherent powers." *Amlong & Amlong, P.A. v. Denny's, Inc.* 500 F.3d 1230, 1239 (11th Cir. 2007). The statute was designed to sanction attorneys who "willfully abuse the judicial process by conduct tantamount to bad faith." *Schwartz v. Millon Air, Inc.,* 341 F.3d 1220 (11th Cir. 2003). Bad faith exists "where an attorney knowingly or recklessly pursues a frivolous claim" that results in proceedings that would not have been conducted otherwise. *Peterson v. BMI Refractories,* 124 F.3d 1386, 1396 (11th Cir. 1997). In addition, a district court may impose sanctions for egregious conduct by an attorney even if the attorney acted without the specific purpose or intent to multiply the proceedings. *Amlong*, 500 F.3d at 1239. If the district court determines the attorney's conduct meets this standard, the district court may order the attorney to pay the "costs, expenses, and attorneys' fees reasonably incurred" because of the attorney's misconduct-that is, the excess costs that the attorney's multiplication of proceedings has added to the cost of the litigation. *Id.* at 1242.

Here, Respondents' counsel has unreasonably multiplied these proceedings by engaging in all the conduct that is outlined in the Factual Background section. As a result of Respondents' and Respondents' counsels' actions, and the unnecessary litigation, Nicole has been forced to incur nearly $300,000 in fees and costs that could have been avoided. Thus, the imposition of sanctions against Respondent's counsel under 28 U.S.C. § 1927 is warranted.

## III.   THE COURT SHOULD USE ITS INHERENT AUTHORITY TO SANCTION RESPONDENTS AND THEIR ATTORNEYS FOR THEIR BAD FAITH.

Federal courts are vested with inherent power to remedy the misconduct of attorneys and parties practicing before them. *United States v. Butera*, 677 F.2d 1376, 1383 (11th Cir. 1982) ("We join ... in the sentiments of our brethren in the Second Circuit that it may be necessary to consider more direct sanctions to deter prosecutorial misconduct ... [w]e encourage the district courts in this circuit to remain vigilant, give appropriate curative instructions when called for,

and consider more formal disciplinary action in cases of persistent or flagrant misconduct.")
(citing *United States v. Modica*, 663 F.2d 1173, 1182-86 (2d Cir. 1981)).  The Court's power is
derived from its need to "manage [its] own affairs so as to achieve the orderly and expeditious
disposition of cases." *Chambers v. NASCO, Inc*., 501 U.S. 32, 43 (1991).  Notably, the "inherent
power of a court can be invoked even if procedural rules exist which sanction the same conduct."
*Id*. at 46.  In addition, this power "permits the court to impose as part of the fine attorney's fees
representing the entire cost of the litigation." *Id.* at 45.

One aspect of a court's inherent power is the ability to assess attorneys' fees and costs
against the client or his attorney, or both, when either has "acted in bad faith, vexatiously,
wantonly, or for oppressive reasons." *Id*. at 45-46.  A finding of bad faith is warranted where an
attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for
the purpose of harassing an opponent. *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998).
A party also demonstrates bad faith by delaying or disrupting the litigation or hampering
enforcement of a court order. *Id*.

Additionally, the Court's inherent power extends to sanctioning the government and its
attorneys for bad faith conduct.  *See U.S. v. Shaygan*, 2009 WL 980289 (S.D. Fla. 2009) (noting
that federal courts are vested with inherent authority to remedy the misconduct of attorneys and
parties practicing before them including the remedying of prosecutorial misconduct) (citing
*Butera*, 677 F.2d at 1383); *see also Bradley v. United States*, 866 F.2d 120, 128 (5th Cir. 1989)
(concluding that court should not have government's misconduct "unsanctioned" and instructing
court on remand that "pursuant to its inherent power to enforce its own rules" it should consider
"requiring the government to compensate the Bradleys and their counsel for their expenses
attributable to the government's conduct."); *United States v. Woodley*, 9 F.3d 774, 782 (9th Cir.
1993) (noting that "[s]overeign immunity does not bar a court from imposing monetary sanctions
under an exercise of its supervisory powers"); *F.D.I.C. v. Maxxam, Inc*., 523 F.3d 566, 596 (5th
Cir. 2008) (authorizing monetary sanctions under court's inherent power against government for
prosecutorial misconduct).

In light of these authorities, Respondents and their counsel have unreasonably multiplied
these proceedings by engaging in all the conduct that is outlined in the Factual Background
section.  As a result of Respondents' and Respondents' counsels' actions, and the unnecessary
litigation, Nicole has been forced to incur nearly $300,000 in fees and costs that could have been

avoided.  Thus, the imposition of sanctions against Respondent's counsel under the Court's inherent authority.

## IV.    LOCAL RULE 7.3 REQUIREMENTS

In accordance with Local Rule 7.3 regarding Attorneys Fees and Costs and 28 U.S.C. § 2412, Nicole specifies the following:  (1) the judgment and statute entitling the moving party to the award; (2) the amount sought; (3) the basis for the fees to be paid; (4) an itemized statement from the attorney setting forth the time expended and the rate used in computing the fee; and (5) a description of the work involved.  As discussed above, Nicole Defontes is entitled to her fees and costs pursuant to 28 U.S.C. § 2412, 28 U.S.C. § 1927, and the court's inherent authority.  Petitioner's motion is timely in that the Court entered final judgment dismissing plaintiffs' claim on September 30, 2010.  Although the Local Rule contemplates service of this motion on opposing counsel before it is filed, the EAJA requires that a motion under the EAJA be filed within 30 days of the entry of the final judgment.  Therefore, in an abundance of caution, we are filing the motion now.

Ms. Defontes' fees and costs are based on all the work that was performed in litigating this case, including time spent investigating, researching, writing, taking depositions, analyzing discovery, and arguing at hearings.  The work performed is reflected in the attached bills.  As set out fully below, the bulk of the work was performed by Mr. Daniel Fridman and Ms. Monica Vila.

Mr. Fridman is a partner of the law firm Holland & Knight.  He is an experienced trial lawyer who practices in the areas of complex business litigation and white collar criminal defense.  He formerly worked as a federal prosecutor with the U.S. Attorney's Office in Miami, as Counsel to the Deputy Attorney General of the United States, and Special Counsel for Health Care Fraud at the U.S. Department of Justice in Washington, D.C., before entering private practice.  Mr. Fridman is a *cum laude* graduate of Harvard Law School and clerked for the Honorable Alan S. Gold, U.S. District Court, Southern District of Florida.

Ms. Vila is an associate at Holland & Knight.  Ms. Vila practices in the areas of appellate litigation and trial support.  She graduated with honors form the University of Florida Levin College of Law and served as a judicial clerk on the United States Court of Appeals for the Eleventh Circuit.

Mr. Markus is a partner at Markus & Markus, PLLC.  He graduated *magna cum laude* from Harvard Law School and served as a law clerk in the District Court for the Southern District of Florida before entering private practice and serving as Federal Public Defender. The National Law Journal selected him as one of the top 40 litigators in the country under 40 years old, and it has recognized one of his recent trial victories in federal court as one of the top ten defense verdicts in the country that year.  In addition, Mr. Markus was also awarded the highest honor -- the Rodney Thaxton "against all odds" award -- by the Florida Association of Criminal Defense Lawyers.  In addition, in 2010, he was one of eight finalists for best white-collar criminal lawyer in the country by Chambers & Partners.

Mr. Hogan is a partner at Holland & Knight and serves as Chair of Holland & Knight's South Florida Litigation Practice Group, and Co-chair of the Firm's national White Collar Criminal Defense Team. Prior to joining the firm, Mr. Hogan served as Chief of Staff to the Attorney General of the United States; Acting United States Attorney for the Northern District of Georgia in Atlanta; Counselor to the Attorney General of the United States; Associate Deputy Attorney General of the United States; Chief Assistant State Attorney for Miami-Dade County, Florida; and First Statewide Prosecutor of Florida.

Mr. Llorente, during the time of this litigation, was an associate at Holland & Knight.

The following charts set out (1) as to attorneys' fees: the nature of the work performed, by whom, the amount of billable hours, and the cost of that work; and (2) as to costs: the description and amount.  In addition, the itemized billing records are attached as Exhibit A.

A.    ATTORNEYS' FEES AND COSTS[9]

1.    Fees

| | Billable Hours Re: Nicole Michelle Defontes | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Initial Investigation | Preparation of Petition for Writ of Mandamus and Habeas Corpus | Preparation of Initial Briefs and Hearing | Litigation of motion for reconsideration | Motion for Attorney's Fees and Costs[10] | Total | Rate per hour | Amount |
| **Attorney** | | | | | | | | |
| DANIEL FRIDMAN | 28.50 | 61.50 | 78.20 | 124.10 | 4.40 | 296.7 | $400-$425[11] | $120,805 |
| MONICA VILA | 16.10 | 72.80 | 43.30 | 217.30 | 41.50 | 391.0 | $280 | $109,480 |
| JOHN HOGAN | 0.20 | ⎯ | ⎯ | ⎯ | ⎯ | 0.20 | $655 | $131.00 |
| DAVIS MARKUS | ⎯ | 6.0 | 12.70 | 3.56 | ⎯ | 22.26 | $500 | $11,130.00 |
| MICHAEL LLORENTE | ⎯ | ⎯ | 3.30 | 1.10 | ⎯ | 4.40 | $245 | $1,078.00 |
| **Paralegal** | | | | | | | | |
| ALICIA APONTE | 0.10 | ⎯ | ⎯ | ⎯ | ⎯ | 0.10 | $165 | $16.50 |
| SALLY STAUFFER | ⎯ | ⎯ | 4.30 | ⎯ | ⎯ | 4.30 | $230 | $989.00 |
| MARTHA FIELDS | ⎯ | ⎯ | ⎯ | 0.90 | ⎯ | 0.90 | $235 | $211.50 |
| **TOTAL** | 44.90 | 140.30 | 141.80 | 346.96 | 45.90 | 719.86 | ⎯ | $243,841.00 |

---

[9] These charts represent the fees and costs incurred by Ms. Defontes through 9/30/2010.  Ms. Defontes will supplement this information at a later date with the fees and costs incurred after 9/30/2010 in preparation of this motion for attorneys fees and costs.

[10]  A prevailing party may be awarded attorney's fees for the time spent litigating the appropriateness of the fee applications, and the court need not make a separate finding that the government's position in the fee litigation was not substantially justified in order to award fees for that aspect of the litigation.  *Comm'r, I.N.S. v. Jean*, 496 U.S. 154 (1990).

[11] Mr. Fridman's fee rate per hour was $400 for the hours billed during the period of 8/13/09-12/28/09 and Mr. Fridman's rate per hour was $425 for the hours billed during the period of 1/04/2010-present.

###### 2.     Costs

| DESCRIPTION | COST |
|---|---|
| Photocopies | $894.80 |
| Facsimile | $23.00 |
| Postage - Express Mail/ Federal Express/ Other Courier-Miami Express | $111.46 |
| Travel/Parking/Mileage Expenses | $331.60 |
| Long Distance Telephone Calls | $78.72 |
| Legal Research - Westlaw/ Lexis | $15,353.42 |
| Other Online Research/ Computerized Database Research (Pacer, Accurint, ChoicePoint) | $239.46 |
| Other costs (Court Reporter/ Transcript Fees/ Witness Fees/ Service of Process/ Deposition costs/ Filing fees) | $4,889.33 |
| Tabs/Velobinding | $194.20 |
| Investigative Fees (Investigator—Michael Kane) | $10,230.00 |
| Expert Witness Fees (H. Chip Walls) | $2,500.00 |
| **TOTAL** | $34,845.90 |

**TOTAL FEES AND COSTS THROUGH 9/30/2010**:      $ 278,686.90

###### 3.     FINAL JUDGMENT

The Judgment entitling Petitioner to Attorney Fees in this case is the "Order Denying Respondents Motion for Reconsideration" filed by this Court on September 30, 2010.

### CONCLUSION

Pursuant to 28 U.S.C. § 2412, 28 U.S.C. § 1927, and the Court's inherent authority, Petitioner Nicole Michelle Defontes respectfully requests that the Court enter an Order granting Nicole Defontes' Motion for Attorneys' Fees and Costs in the amount of $278,686.90 (plus fees and costs expended in preparing and litigating the motion for fees and costs) against Respondents and entering any and all further relief the Court deems equitable and just.

## CERTIFICATION UNDER RULE 37(a) AND LOCAL RULE 7.1.A.3. AND 7.3

Pursuant to Federal Rule of Civil Procedure 37(a) and Local Rules 7.1.A.3. and 7.3, counsel for Petitioner has conferred with counsel for Respondents in an effort to resolve this issue without court action.  Counsel for Respondents opposes the Motion.

## VERIFICATION

I, Daniel Fridman, lead attorney for Petitioner, Nicole Michelle Defontes, swear and affirm that I have personal knowledge of the facts set forth in Petitioner's Motion for Attorneys' Fees and Costs and that such facts are true and correct to the best of my knowledge.

Respectfully submitted,

HOLLAND & KNIGHT
701 Brickell Avenue, Suite 3000
Miami, Florida 33131
Tel.:(305) 789-7412
Fax: (305) 679-6420

By: _____/s Daniel S. Fridman_____
DANIEL S. FRIDMAN
Florida Bar Number: 0176478
daniel.fridman@hklaw.com
MONICA VILA
Florida Bar Number: 0022976
monica.vila@hklaw.com

DAVID OSCAR MARKUS
Florida Bar Number 119318
DMarkus@MarkusLaw.com
DAVID OSCAR MARKUS, PLLC
169 East Flagler Street, Suite 1200
Miami, Florida 33131
Tel: (305) 379-6667
Fax: (305) 379-6668
www.markuslaw.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 30, 2010, a copy of the foregoing was sent via CM/ECF electronic filing to Amanda Kessler, United States Attorney's Office, 99 NE 4th Street, Miami, FL 33132.

_____/s Daniel S. Fridman_____
Daniel S. Fridman